**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kumpers Composites GmbH & CoKG,

Plaintiff,

v.

TPI Composites Incorporated,

Defendant.

No. CV-23-00214-PHX-SMB

**ORDER**

Before the Court are Plaintiff Kumpers Composites GmbH & CoKG's ("Kumpers") Partial Motion for Summary Judgment (Doc. 78) and accompanying Statement of Facts (Doc. 79), as well as Defendant TPI Composites Inc.'s ("TPI") Partial Motion for Summary Judgment (Doc. 81) and accompanying Statement of Facts (Doc. 82). The Motions are ripe, and the Court has reviewed the parties' briefs as well as the relevant case law. The Court will grant in part and deny in part the parties' respective Motions (Doc. 78; Doc. 81).

**I.    BACKGROUND**

This case concerns the negotiation, execution, and performance of various contracts between a German carbon fabric supplier and an American company operating in the wind turbine industry. Kumpers is a German company headquartered in Germany that manufactures carbon fabrics for structural applications in various industries, including wind power. (Doc. 78 at 2; Doc. 79 at 1 ¶ 1.) TPI, a Delaware corporation headquartered in Arizona, uses carbon fabric and other products to manufacture wind turbine blades. (Doc. 79 at 1 ¶ 2; Doc. 82 at 1 ¶¶ 1–2.) The parties engaged one another and eventually

executed two contracts, the performance of which became a hotly debated subject following the start of the war between Russia and Ukraine in 2022.  Now, before getting to the meat of the pending Motions, the Court will provide context for the parties' agreements and the issues that arose in the wake of the war in Europe.

### A.    The Parties' Agreements

The parties executed two agreements that are central to this case.  First, on May 20, 2021, the parties entered a contract for a three-year term governing the delivery of a certain type of carbon fabric that TPI uses to manufacture wind turbine blades (the "Master Agreement").  (Doc. 79 at 1–2 ¶¶ 3–4.)  Several provisions in the Master Agreement are relevant here.  Section A provides:

> **CONTROLLING DOCUMENTS, THE AGREEMENT**. This agreement will take precedence over any Supplier quote, acknowledgement or other Supplier form or document.  Except to the extent modified by TPI's PO or by mutual agreement through a supply agreement, the terms and conditions in the Agreement will apply to all supply agreements between the parties and Pos placed by TPI with Supplier for all TPI sites, TPI's Pos and/or supply agreements may include or include by reference specifications (the "Specifications"), drawings and other terms, which may modify or be in addition to the terms of this Agreement. If the Supplier's quotation or proposal is referred to in a PO and/or attached to the Po, the intent of such reference or attachment is only to specify the nature and description of the Products ordered and only to the extent that such terms are consistent with this Agreement. If the Supplier's quotation or proposal is referred to in a PO and/or attached to the PO, the intent of such reference or attachment is only to specify the nature and description of the Products ordered and only to the extent that such terms are consistent with this Agreement. Conflating terms and conditions in any document generated by Supplier with be disregarded in favor of this Agreement. This agreement can only be amended by a writing signed by both parties.

(Doc. 79 at 7 (bold in original).)  Section U.1's "Termination for Convenience" clause states:

> At TPI's convenience, TPI may terminate this Agreement, a supply agreement and/or a PO by written notice as to all or any part of the Products not delivered, except for any POs for Products that, in good faith, are already in the manufacturing or delivery process (including non-cancellable orders for reasonable quantities of raw materials for which Supplier has no other use), prior to receipt by Supplier of the notice. Upon receipt of such notice, Supplier shall immediately discontinue all efforts under the Agreement, the supply agreement and/or PO. As to Products that are standard manufactured items, TPI's only obligation shall be to pay for Products delivered to TPI prior to receipt of the notice of termination. As to Products specially manufactured for TPI, Supplier will stop all work on receipt of notice of termination, unless otherwise directed by TPI. Upon such termination, TPI

will pay reasonable costs incurred by Supplier directly connected with the supply agreement and/or PO, including costs and cancellation charges actually incurred by Supplier under subcontracts (such as those involving otherwise non-usable raw materials). Such settlement proposal shall be provided to TPI within ten (10) working days of receipt of T notice to terminate. Such payment shall not exceed the total price of the supply agreement and/or applicable PO, and shall be reduced by any deposits, refunds or salvage values available to Supplier. Upon such payment, title to Products and/or Services shall pass to TPI.

(*Id.* at 11–12.)  Section V provides that certain notices, including notice of termination for convenience, must be:

[I]n writing and be delivered to the parties at the addresses as set forth on the PO or any other address that a party may designate by notice to the other party. Notices are considered delivered upon actual receipt if delivered personally or by fax or an overnight delivery service, and at the end of the third business day after the date of deposit in the United States mail, postage pre-paid, certified, return receipt requested.

(*Id.* at 12.)  Section M contains a choice of law clause declaring that "[t]his Agreement, any supply agreement and all POs are governed by the laws of the State of Arizona, without giving effect to any choice-of-law principles."  (*Id.* at 9.)  The Master Agreement is silent as to the applicability of the United Nations Convention on Contracts for the International Sale of Goods (the "CISG").  (*See id.* at 7–13; *see also* Doc. 78 at 4–13; Doc. 81 at 7–9.)  Additionally, Section X provides for an "Agreement Interpretation" clause, which states:

This Agreement [and] any supply agreement between the parties . . . contain the entire understanding of the parties regarding the subject matter of this agreement and supersedes all prior and contemporaneous negotiations and agreements, whether written or oral, between the parties with respect to the subject matter of this Agreement.

(Doc. 79 at 12.)

Regarding the second agreement, on June 6, 2021, TPI invited Kumpers to submit a commercial proposal outlining its suggested terms for supplying TPI with UD600 from January 2022 through March 2023.  (Doc. 82 at 2 ¶ 8; Doc. 79 at 16.)  On January 1, 2022, after the exchange of several written drafts, the parties executed a supplier agreement (the "Supplier Agreement").  (Doc. 82 at 2–3 ¶¶ 10–11; Doc. 79 at 2 ¶ 9.)  Like the Master Agreement, the Supplier Agreement contains several relevant provisions.  First, the Supplier Agreement provides that "[a]ll terms, provisions, and agreements contained in

that certain Master Agreement entered into by the Parties and dated May 20, 2021, are hereby incorporated by reference with the same force and effect as though fully set forth herein." (Doc. 79 at 15.) The Supplier Agreement then outlines TPI's 2022 purchase obligations, which included "700 MTs" of "UD600."[1] (*Id.* at 16.) Kumpers agreed to supply no less than 40 MT per month from January to June and no less than 60 MT per month from July to December. (*Id.*) Section 2.1.1 permitted TPI and Kumpers to "mutually agree to shift the time frame" without breaching the agreement "provided that the total commitment is met." (*Id.*)

The Supplier Agreement also sets out various terms to account for costs incurred through freight and currency exchange rates. Section 5.4 provides a cost-based adjustment on freight expenses:

> Pricing in Attachment B includes a per container rate (door to door delivery) of 4000€. As part of the quarterly pricing review, the freight cost element may be subject to adjustment, If the change in the freight costs is greater than or equal to +/-500€, as verified by invoices for TPI shipments. Container is defined as a 40' high container containing approximately 20 metric tons of Product.

(Doc. 79 at 17.) Section 5.2 defines a "Foreign exchange rate" to account for fluctuations between the value of the United States Dollar and the Euro. (*Id.*) Specifically, the term provides that "[t]he exchange rate shall be reviewed quarterly based on the average change in the past 3 months to be found at www.oanda.com." (*Id.*) Section 5.5 lays out the schedule for adjustment timings, wherein "all index-based prices need to be agreed and finalized by day 7 of the month prior to the start of the quarter, for example, March 7th, 2022 for Q2 2022 price; June 7th for Q3 price, and Sept. 7th for Q4 price." (*Id.* at 18.) The Supplier Agreement also includes a force majeure clause, which provides, in relevant part:

> Force Majeure of the Master Agreement is superseded as follows: Notwithstanding anything to the contrary provided herein, neither Party will be liable to the other for damages for failure to carry out this Supply Agreement in whole or in part when the failure is due to causes beyond

---

[1] The parties measure the weight of raw materials in metric tons ("MT"). One-thousand kilograms ("kg") constitute a single MT.

- 4 -

Supplier's or Customer's (as applicable) reasonable control, …; provided, that, such excuse from liability shall be effective only to the extent and duration of the event(s) directly causing the failure or delay in performance and provided that the party has not caused such event(s) to occur . . . .

(*Id.* at 19.)  The last term in the agreement was an "entire agreement" clause, which states that it "constitutes the entire agreement between [Kumpers] and TPI regarding the sale and purchase of Products and supersedes all prior agreements, negotiations and discussions, written or oral, and there are no additional terms or understandings."  (*Id.* at 20.)

**B.    The 2022 Price Dispute**

In March 2022, the parties determined that there would be no price adjustment for the second quarter of 2022.  (Doc. 82 at 3 ¶ 12.)  However, by June 2022, the average price for acrylonitrile, a chemical used to produce UD600, dropped below the parties' agreed-upon range.  (*Id.* at 5 ¶ 26.)  Faced with the price decrease, the parties decided to lower the amount TPI would pay for UD600 during the third quarter of 2022.  (*Id.* ¶ 26.)  However, in late July 2022, Kumpers notified TPI that it was experiencing heightened costs and needed to increase its prices to compensate for present and impending losses.  (*Id.* ¶ 31.)  On August 5, 2022, Kumpers emailed TPI that it intended to increase the price of UD600 by €3.01 per kg.  (*Id.* at 6 ¶ 32.)  In response, TPI requested detailed information supporting the price increase and remarked that the Supplier Agreement did not allow Kumpers to unilaterally change the price.  (*Id.* ¶ 33.)  TPI also shared its expectation that Kumpers comply with the Supplier Agreement, which set the anticipated fourth quarter price €0.32 per kg lower than the third quarter price.  (*Id.*; *see also* Doc. 82-5 at 54.)

On August 26, 2022, Kumpers' interim Commercial Director, David Shyne, sent an email to TPI stating: "I cannot [and] will not continue to supply TPI beyond September 1st 2022 at the existing selling price.  Right now the minimum to return this product to marginal viability is a €2.19 per Kg increase."  (Doc. 82-5.)  TPI considered Mr. Shyne's email a threat to stop shipments unless TPI agreed to a price increase that the Supplier Agreement did not support.  (Doc. 82 at 6 ¶¶ 36–37.)  Thus, TPI maintains that it began to evaluate the basis for Kumpers' cost increase and investigate the viability of sourcing its

full volume needs from a different supplier, Metyx Composites ("Metyx").  (*Id.* ¶¶ 35–37; Doc. 82-1 at 14–15 ¶¶ 16–20.)  On July 25, 2022, TPI's Global Category Manager, Angela Hensing, sent an email to fellow TPI employee, Mayk Chahine, in which she characterized Kumpers' price increase as "bogus" and wrote that, "if [Kumpers] go[es] as far as claiming [force majeure], we should be entitled to walk away from our volume commitment and get this at a better cost from Metyx." (Doc. 105-3 at 72.)  Then, in a September 21, 2022 email, Ms. Hensing suggested cancelling all orders with Kumpers after October 1, 2022 and assigning the supply volume to Metyx.  (Doc. 105-4 at 23.)  Afterward, on September 23, 2022, Mr. Chahine sent Kumpers a letter detailing TPI's intent to pursue a breach of contract action if Kumpers went forward with a price increase for the remaining UD600 volumes.  (*See* Doc. 105-4 at 71–72.)  In a subsequent meeting, TPI reaffirmed to Kumpers that it would honor the Supplier Agreement but would seek UD600 from an alternate supplier if faced with the unilateral price increase.  (Doc. 82 at 7 ¶ 40; Doc. 82-4 at 13.)

At some point in September 2022, Kumpers withdrew its "prior threat" to stop shipments but insisted on an unavoidable price increase to continue business under the Supplier Agreement.  (Doc. 82 at 7 ¶ 39.)  Thereafter, Kumpers notified TPI that (1) continuing to supply UD600 to TPI at the current rate was "no longer tenable"; (2) it had already informed its raw carbon supplier, SGL, to "divert material in reserve for TPI to alternative markets/customers"; (3) it would "ensure supply in full to [TPI] . . . until the end of October"; (4) it would implement a price increase of €3.34 per kg "with immediate effect" and issue "retrospective invoices for volumes supplied up to 09/19/22"; and (5) it expected TPI to reimburse it for currency exchange losses from the inception of the Supplier Agreement or TPI would risk breaching the contract.  (Doc. 82 at 7 ¶ 41; Doc. 82-4 at 44–45.)  TPI then informed Kumpers that it would not accept shipments marked at the higher price.  (Doc. 82 at 7 ¶ 41.)  According to TPI, the communications following the discussion of the price increase became "somewhat circular," as Kumpers stated it would invoice at the third quarter price subject to a right to retrospectively charge the increased price, and TPI demanded invoices and release of the shipments without any reservation.

(Doc. 81 at 6; Doc. 82 at 7 ¶ 42.)

Kumpers' Controverting and Separate Statement of Facts takes a different view of the parties' price dispute. In June 2022, TPI forecasted orders of UD600 through the end of 2022 that were "materially below" the required monthly commitments in the Supplier Agreement, which prompted Kumpers to immediately inquire into TPI's intentions. (Doc. 105 at 8–9 ¶ 24.) According to Kumpers, TPI intended to cut ties with it after the Supplier Agreement terminated in March 2023. (*Id.*; Doc. 105-2 at 97.) This particularly surprised Kumpers because it believed TPI committed 55% of its 2023 volume requirement to Kumpers. (Doc. 105 at 8–9 ¶ 24; Doc. 105-2 at 97.) On July 19, 2022, Kumpers notified TPI that it was experiencing financial hardship due to the "Russian/Ukraine situation." (Doc. 105 at 9 ¶ 25; Doc. 105-3 at 64–66, 68.) One of Kumpers' priorities was to keep the cost ratio under the Supplier Agreement at an 82/18 rate (i.e., Kumpers' costs were approximately 82% of the purchase price for UD600). (Doc. 105-1 at 141; Doc. 105-2 at 101.) The remaining 18% was Kumpers' "conversion cost," or the share of TPI's payment covering "production costs, management costs, . . . [and] profit." (Doc. 105-1 at 141–144; *see also id.* at 228 ("[TPI] clearly understand[s] Kuempers needs to keep an 18% conversion cost . . . as a bottom line").)

At some point, Kumpers informed SGL that it would purchase all raw carbon required to complete the volume requirements in the Supplier Agreement. (Doc. 105-1 at 5–6 ¶ 25.) Before doing so, Kumpers attempted to confer with TPI, inquiring about whether TPI planned to purchase the outstanding remainder of the 700 MT volume commitment. (*Id.*; Doc. 105-4 at 51–44.) According to Kumpers, TPI did not respond, but Kumpers went ahead and placed the Order with SGL to ensure that it complied with the Supplier Agreement. (Doc. 105-1 at 5–6 ¶ 25.)

### C.    The 2023 "Contract"

The parties also dispute whether their negotiations prior to and during the 2022 price dispute resulted in a valid and enforceable contract for the production and delivery of UD600 through 2023. Kumpers supplied TPI with UD600 from its factory in Lathen,

Germany.  (Doc. 82 at 2 ¶ 5.)  In February 2022, shortly after the execution of the Supplier Agreement, Kumpers alerted TPI that it may close the Lathen factory unless TPI could commit to extending its purchase commitment under the agreement beyond March 31, 2023.  (Doc. 82 at 3 ¶ 13; Doc. 105 at 7 ¶¶ 20–21.)  According to Kumpers, the lease on the factory was unsustainable without TPI's commitment for future business.  (Doc. 82 at 3 ¶ 14.)  Kumpers asked TPI to decide whether it would extend its purchase obligations no later than March 2022.  (Doc. 91 at 4 ¶ 10.)  TPI expressed shock because Kumpers supplied UD600 from the Lathen plant for years, and the parties recently finalized the Supply Agreement without Kumpers mentioning an urgent lease issue.  (Doc. 82 at 3 ¶ 15.)  TPI relayed to Kumpers that it did not have any forecasts or orders from its customer for products for 2023 and would not until approximately July or August 2022.  (*Id.* ¶ 16.)

On April 27, 2022 Ms. Hensing, emailed Kumpers' employee, Ayham Younes, writing that "[a]fter further internal review and discussion, contingent on [Kumpers'] ability to demonstrate consistent improved delivery performance and agreement on improved payment terms, the **most** we can offer [Kumpers] at this time and at this pricing of the NX 58.5 UD600 is 55% [of our 2023 volume need]."  (*Id.* 3–4 ¶ 17 (bold and underline in original); Doc. 82-4 at 2.)  That same day, Mr. Chahine, sent a separate follow-up email to Kumpers' Joint Managing Director, Dr. Nicolas Maggiarosa, intending to reaffirm what Ms. Hensing had communicated to Mr. Younes.  (Doc. 82 at 4 ¶ 18.)  On May 2, 2022, Dr. Maggiarosa responded, stating that "although 55% of your 2023 volume . . . seems to be quite low, we accept your proposal in anticipation that this will further strengthen our business relationship."  (Doc. 82-4 at 67–68.)  Kumpers maintains that these emails constituted a valid contract for 2023 volumes, despite no formal writing memorializing the terms.  (Doc. 97 at 15, 18.)

### D.    TPI Terminates the Supplier Agreement

By late November 2022, TPI began to seriously consider terminating the Supplier Agreement after determining that it was no longer convenient to do business with Kumpers. (Doc. 82 at 7–8 ¶ 46.)  By this point, TPI had learned that Metyx could supply its volume

needs, and therefore TPI's strategy was to award Metyx a contract for the bulk of its 2023 UD600 volume. (*Id.* at 8 ¶ 51.) Around December 22 or 23, 2022, TPI sent Kumpers an email seeking to give notice that TPI was invoking the termination for convenience clause and terminating the Supplier Agreement. (*Id.* at 2 ¶ 11; Doc. 91 at 2 ¶ 11; *see also* Doc. 79 at 26.) Mr. Shyne responded that he "acknowledge[d] receipt of [the] mail & attached correspondence" and that he would "respond in due course[.]" (Doc. 82-1 at 22.) Then, on February 16, 2023, TPI sent a second notice of termination by mail, fax, overnight delivery, and certified mail. (Doc. 82 at 9 ¶ 59.) On February 27, 2023, Kumpers provided TPI with a settlement proposal pursuant to Section U.1 of the Master Agreement. (Doc. 91 at 7 ¶ 27; Doc. 105 at 11 ¶ 31.) The parties did not reach a settlement, however.

### E.    The Instant Lawsuit

Kumpers filed its initial Complaint on February 1, 2023 (Doc. 1) and an Amended Complaint (Doc. 66) on August 13, 2024. TPI then filed an Answer (Doc. 71.) Discovery is closed, and both parties have filed Motions for Partial Summary Judgment (Doc. 78; Doc. 81), which the Court will now consider.

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of a case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. Additionally, the Court does not make credibility determinations or weigh the evidence. *Id.* at 253. The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case. *Id.* at 255.

The burden initially falls with the movant to demonstrate the basis for a motion for summary judgment, and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has a burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 247–50 (citations omitted).

## III.    DISCUSSION

### A.    Kumpers' Motion for Partial Summary Judgment

#### 1.    The CISG

First, Kumpers motions the Court to determine whether the CISG or Arizona law governs the Master Agreement and Supplier Agreement (collectively, the "Agreements"). (Doc. 78 at 1.) From Kumpers' perspective, the CISG applies because the parties did not expressly exclude its application. (Doc. 78 at 7.) According to Kumpers, to prevent the CISG from governing, the parties needed to have included a provision unequivocally rejecting the application of CISG. (*Id.* at 5 (citing *Ajax Tool Works, Inc. v. Can-Eng Mfg.*

1    *Ltd.*, No. 01 C 5938, 2003 WL 223187, at *2 (N.D. Ill. Jan 30, 2003); *Buergofol GmbH v.*

2    *Omega Liner Co.*, No. 4:22-CV-04112-KES, 2024 WL 3541248, at *17 (D.S.D. July 25,

3    2024)).)  Kumpers also contends that the Supremacy Clause makes the CISG the law of

4    Arizona governing contracts for the sale of international goods.  (*Id.* at 6 (citing *Asante*

5    *Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001)).)

6    Therefore, even if "Arizona law" governs the Agreements, the law of Arizona is the CISG.

7    (*See id.*)

8        In response, TPI argues that the unambiguous choice of law clause excludes the

9    application of the CISG.  (Doc. 90 at 5.)   According to TPI, because the contractual

10    language gives no weight to "any conflict of law principles," the parties' intended to apply

11    Arizona law and not the CISG.  (*Id.* at 6.)  In reply, Kumpers argues that there is no conflict

12    of law to be resolved, as the CISG is the law of every state under the incorporation of the

13    treaty into the various states' law through the Supremacy Clause.  (Doc. 106 at 3, n.3.)

14        Contracts for the international sale of goods "are ordinarily governed by a

15    multilateral treaty, [the CISG] . . . , which applies to 'contracts of sale of goods between

16    two parties whose places of business are in different States . . . when the States are

17    Contracting States.'"  *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528,

18    530 (9th Cir. 2003) (citing CISG, art. 1 § 1(a); 52 Fed. Reg. 6262 (March 2, 1987)); *see*

19    *also Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co.*, No. 06 Civ. 3972 (LTS)(JCF),

20    2011 WL 4494602, at *3 (S.D.N.Y. Sept. 28, 2011) ("[The CISG] automatically applies to

21    international sales contracts between parties from different contracting states unless the

22    parties agree to exclude [its] application.").  The CISG creates a private right of action in

23    federal court.  *See BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d

24    333, 336 (5th Cir. 2003).  Both the United States and Germany are Contracting States to

25    the CISG.  *See St. Paul Guardian Ins. v. Neuromed Med. Sys. & Support, GmbH*, No. 00

26    CIV.9344(SHS), 2002 WL 465312, at *3 (S.D.N.Y. 2002), *aff'd*, 53 F. App'x 173 (2d Cir.

27    2002).  "A signatory's assent to the CISG necessarily incorporates the treaty as part of that

28    nation's domestic law."  *BP Oil*, 332 F.3d at 337; *see also Travelers Prop. Cas. Co. Am. v.*

*Saint-Gobain Tech. Fabrics Canada Ltd.*, 474 F. Supp. 2d 1075, 1082 (D. Minn. 2007) ("[E]ven if a choice of law clause refers to the laws of a particular state, the state would be bound by the Supremacy Clause to the treaties of the United States." (internal quotation marks omitted)); 200 A.L.R. Fed. 541 ("Simply stating in the choice of law clause that the law of a particular state will govern the contract is not sufficient, since the CISG, as a federal law of the United States, is also a part of the law in every state.").

Cases discussing what contractual language is sufficient to disclaim the CISG have been inconsistent and, at times, derided as plainly incorrect. *See, e.g.*, *Am. Biophysics Corp. v. Dubois Marine Specialties*, 411 F.Supp.2d 61, 63 (D.R.I. 2006) (finding that contractual language signifying the law of "Rhode Island" applies to the agreement sufficient to disclaim the CISG's application); *Adonia Holding GmbH v. Adonia Organics LLC*, CV-14-01223-PHX-GMS, 2014 WL 7178389, at *3 n.1 (D. Ariz. Dec. 16, 2014); *see also See* Modern Law of Contracts § 23:5, n.4 (questioning the correctness of *American Biophysics Corp.*). Fortunately, examination of the case law reveals a majority rule requiring a contractual provision to do more than simply declare that state or territorial law applies. *See, e.g.*, *Travelers*, 474 F. Supp. 2d at 1081–82 (citing cases).

In *Travelers*, the court explained that "a reference to a particular state's law does not constitute an opt out of the CISG" and instead that contracting parties must "expressly state that the CISG does not apply." *Id.* The court reasoned that an express disclaimer is necessary because the Supremacy Clause automatically incorporates the CISG into every state's law to govern the international sale of goods. *See id.* at 1082 (citing *Asante*, 164 F. Supp. 2d at 1150); *see also* U.S. Const. Art. VI, cl. 2; *BP Oil*, 332 F.3d at 337 ("An affirmative opt-out requirement promotes uniformity and the observance of good faith in international trade, two principles that guide the interpretation of the CISG.").

When discussing the treaty, federal courts rely in part on CISG Advisory Council opinions (the "CISG Opinion").[2] *See Cedar Petrochem.*, 2011 WL 4494602, at *5 n.5;

---

[2] "The CISG Advisory Council Opinions are drafted by rapporteurs appointed by the Council." Opinions, CISG Advisory Council, https://cisgac.com/opinions/. The Opinions are primarily designated to assist courts and arbitrators with the uniform interpretation of the CISG when dealing with cases under the CISG.

*TeeVee Toons, Inc. v. Gerhard Schubert GmBH*, No. 00-CIV-5189 (RCC), 2006 WL 2463537, *8 (S.D.N.Y. Aug. 23, 2006); *see also Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027–28 (2d Cir. 1995) ("Because there is virtually no caselaw under the Convention, we look to its language and to the 'general principles' upon which it is based."). Several CISG Opinions are highly instructive here. CISG Opinion No. 16, titled "Exclusion of the CISG under Article 6," provides that a clear intent to exclude should be inferred from (i) express exclusion of the CISG; (ii) choice of the law of a non-Contracting State; or (iii) the choice of an expressly specified domestic statute or code that would otherwise be displaced by the CISG's application.[3]  (CISG Opinion No. 16 at 6–7.) Likewise, a clear intent to exclude should not be inferred merely from (i) the choice of the law of a Contracting State; or (ii) choice of the law of a territorial unit of a Contracting State. *Id.* The Opinion also commented on "a notable line of U.S. cases" finding that "[w]here a choice of law clause indicates that the law of a Contracting State governs the contract, commentators, courts and tribunals have widely accepted that, without more, this will not exclude the CISG, since the CISG forms part of the law of the Contracting State." *Id.* at 8–9 & n.28 (citing *Valero Marketing & Supply Co. v. Greeni Oy*, 373 F. Supp. 2d 475 (D.N.J. 2005), *rev'd*, 242 F. App'x 840 (3d Cir. 2007); *Ajax Tool Works*, 2003 WL 223187, at *1; *Am. Mint LLC v. GOSoftware, Inc.*, No. Civ.A. 1:05-CV-650, 2006 WL 42090, at *1 (M.D. Penn. Jan. 6, 2006); *Travelers*, 474 F. Supp. 2d at 1082 ("[A]bsent an express statement that the CISG does not apply, merely referring to a particular state's law does not opt out of the CISG."); *Asante Techs.*, 164 F. Supp. 2d at 1142; *St. Paul Guardian*, 2002 WL 465312, at *3 (explaining "[w]here parties . . . designate a choice of law clause in their contract–selecting the law of a Contracting State without expressly excluding the application of the CISG" the CISG otherwise applies); *BP Oil*, 332 F.3d at 337 ("Where parties seek to apply a signatory's domestic law in lieu of the CISG, they must affirmatively opt-out of the CISG."); *but see*

---

[3]  This Opinion, as well as others, are available at: https://cisg-online.org/cisg-ac-opinions.

1    *Am. Biophysics*, 411 F.Supp.2d at 63 (finding that the contractual term "shall be construed

2    and enforced in accordance with the laws of the state of Rhode Island" was enough to

3    exclude the CISG with respect to its application on a *forum* selection clause issue)).

4         Nearly all of the available authority supports finding that the choice of law clause

5    in the Master Agreement is insufficient to disclaim the CISG.  Although, TPI offers some

6    case law that it contends supports the opposite result.  First, TPI cites *Amco Ukrservice v.*

7    *Am. Meter Co.*, 312 F.Supp.2d 681, 686 (E.D. Pa. 2004) for the proposition that the CISG

8    applies if the contract "does not contain a choice of law provision."  True, the court in

9    *Ukrservice* stated the rule as such, but it also went on to analyze whether the CISG applied

10   to the parties' joint venture agreement, not whether a choice of law provision impacted the

11   applicability of the CISG to an agreement for the international sale of goods.  *See id.*   As

12   a result, *Ukrservice* does not elucidate what language a contract must contain to disclaim

13   application of the CISG and is therefore distinguishable.

14        TPI's next case, *Adonia Holding*, is distinguishable for similar reasons.  According

15   to TPI, *Adonia Holding* stands for the proposition that the intent of the parties' is the prime

16   mover regarding choice of law, and not the "over-broad" requirement to explicitly opt-out

17   of the CISG.  (*See* Doc. 90 at 6–7.)  The issue in *Adonia Holding*, however, concerned

18   whether the CISG applied to distributor agreements, not whether the choice of law clause

19   designating Arizona law to apply was sufficient to disclaim application of the CISG to a

20   contract for the international sale of goods.  *See* 2014 WL 7178389, at *3.  To be sure, the

21   Court did remark that:

22        Adonia Holding also contends that the CISG is inapplicable because the
         Agreement contains a choice of law provision stating that Arizona law
23       applies. Adonia Organics relies on a nonbinding case for the proposition that
         such a broad choice of law provision does not provide sufficient evidence of
24       the parties' intent to opt out of the CISG. *See Asante Technologies, Inc. v.*
         *PMC–Sierra, Inc.,* 164 F.Supp.2d 1142 (N.D.Cal.2001). The Court finds
25       *Asante* distinguishable because it concerns a battle of the forms between two
         competing contracts, each with a separate choice of law provision. In
26       contrast, the present case concerns a single contract with a single choice of
         law provision, showing a clear intent by both parties to apply Arizona law.
27

28   *Id.* at *3 n.1.  But the Court ultimately held that "[b]ecause the Agreement is *not a contract*

*for the sale of goods* as envisioned by the CISG, the CISG does not apply." *Id.* at 3 (emphasis added). Therefore, *Adonia Holding* is distinguishable as it did not reach the issue of what contractual language disclaims the CISG.[4]

The Court finds the authority on which TPI relies to be inapposite. Now, having considered the applicable case law and CISG Opinion No. 16, this Court joins the chorus of its sister courts and adopts the majority view. *See Travelers*, 474 F. Supp. 2d at 1081–82. Applying that view begets a single result: the CISG applies to the Agreements between Kumpers and TPI. Kumpers is a German company who is a party to two Agreements facilitating the international sale of goods with TPI, an Arizona company. The contractual language declares Arizona law, exclusive of conflict of law principles, as applicable to the parties' transaction. (*See* Doc. 79 at 9.) Given that the CISG, through operation of the Supremacy Clause, is the law of the Arizona, the law governing the Agreements for the international sale of goods in this case is the CISG. *See Travelers*, 474 F. Supp. 2d at 1081–82. Additionally, no conflict of law principles are implicated, and based upon the contractual language, they would not otherwise apply. Therefore, the CISG governs "the formation of the contract of sale and the rights and obligations of the seller [Kumpers] and the buyer [TPI] arising from such contract." *See* CISG art. 4. Accordingly, the Court will grant Kumpers' Motion for Partial Summary Judgment as to the first issue.

## 2.    The Termination for Convenience Clause

Second, Kumpers moves the Court to find that (a) changed circumstances and (b) good faith are conditions precedent to a party invoking a termination for convenience clause. (Doc. 78 at 1.)

Before addressing the parties' arguments, the Court addresses what law applies to this particular issue. Normally, "[a]s a treaty to which the United States is a signatory, the CISG is federal law; thus, under the Supremacy Clause, it preempts inconsistent provisions of [state] law where it applies." *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659,

---

[4] TPI also cites to *American Biophysics*, which was decided prior to the release of CISG Opinion No. 16 and is often derided as being incorrect. *See* Modern Law of Contracts § 23:5, n.4; *see also* CISG Opinion No. 16 at 9–10 n.35. Thus, given the wealth of authority discussed above, the Court finds *American Biophysics* distinguishable and unpersuasive.

673 (N.D. Ill. 2005); *Asante*, 164 F. Supp. 2d at 1152 ("[T]he CISG nevertheless can and does preempt state contract law to the extent that the state causes of action fall within the scope of the CISG."). However, the CISG will not preempt state law causes of action that fall outside the scope of federal law. *See Perkins Mfg. Co. v. Haul-All Equip. Ltd.,* No. 19 CV 03769, 2020 WL 2219050, at *4 (N.D. Ill. May 7, 2020) ("Recognizing the limited scope of CISG's preemption, federal courts have determined that tort claims are generally not preempted by the CISG."); *Caterpillar*, 393 F. Supp. 2d at 676. The CISG does not specifically address termination for convenience clauses, nor does it provide clear guidance on the matter. Further, the parties agree that Arizona law fills the gaps left by the CISG. (*See* Doc. 78 at 9–11 (citing CISG art. 7(2) ("Questions concerning matters governed by [the CISG] which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law.")); Doc. 90 at 10); *see also Maxxsonics USA, Inc. v. Fengshun Peiying Electro Acoustic Co.*, No. 10 C 1174, 2012 WL 962698, at *7 (N.D. Ill. Mar. 21, 2012) (noting that the CISG incorporates state law to fill its gaps). Therefore, the Court will apply Arizona law when analyzing the termination for convivence clause.

According to Kumpers, the lawful exercise of a termination for convenience clause in Arizona requires that the party prove both "changed circumstances" and that the clause was invoked in "good faith." (Doc. 78 at 1, 11–13 (quoting *Ry-Tan Const., Inc. v. Wash. Elementary Sch. Dist. No. 6*, 93 P.3d 1095, 1111 (Ariz. Ct. App. 2004), *vacated on other grounds*, 111 P.3d 1019 (Ariz. 2005); *Ariz. Towing Pros., Inc. v. State of Arizona*, 993 P.2d 1037, 1041 (Ariz. Ct. App. 1999)).) In response, TPI argues that Kumpers misstates the law governing termination for convenience and incorrectly asserts that a specialized standard applies to such clauses. (Doc. 90 at 7.) To support its position, TPI attacks *Ry-Tan* on multiple fronts, including the fact that the Arizona Supreme Court vacated the lower court's opinion and cabined application of *Ry-Tan* to contracts between a government entity and a private party. (*Id.* at 7–8.) Further, TPI relies on *CMS Mechanical*

*Services, LLC v. PetSmart, Inc.*, No. CV-15-02040-PHX-NVW, 2018 WL 1586647, *15 (D. Ariz. Mar. 31, 2018), which discusses the requirements of termination for convenience clauses in contracts between the government and a private party and contracts involving two private parties.  (Doc. 90 at 8–9.)  Regarding the good faith requirement, TPI posits that it does not challenge the general principle of contract law imposing a duty of good faith and fair dealing unto the parties but refutes any attempt by Kumpers to impose a heightened standard of good faith in this case.  (*Id.* at 9.)

In reply, Kumpers contends that Arizona is one of two states that has "adopted" the changed circumstances test, and therefore it applies.  (Doc. 106 at 6 (citing *Davidson Oil Co. v. City of Albuquerque*, 624 F. Supp. 3d 1240, 1250 (D.N.M. 2022)).)  Kumpers also seemingly argues that no heightened good faith standard exists, instead a party terminating for convenience must not abuse its discretion in doing so "by acting in a way that deprives the other party of its bargained-for-rights."  (*Id.* at 7 (quoting *Ariz. Boyz Towing & Transp. LLC v. Town of Gilbert*, No. CV-18-02057-PHX-JZB, 2019 WL 652857, at *7 (D. Ariz. Feb. 15, 2019)).)

There is a dearth of Arizona cases on termination for convenience clauses in contracts between private parties.  Indeed, the doctrine of termination for convenience is a creature of federal common law that allowed the federal government to terminate contracts without paying full expectation damages.  *See Linan-Faye Const. Co. v. Hous. Auth.*, 49 F.3d 915, 923 (3d Cir. 1995); *see also Torncello v. United States*, 681 F.2d 756, 764 (Ct. Cl. 1982).  The doctrine "dates from the winding down of military procurement after the Civil War, and was initially based on the premise that continuing with wartime contracts after the war had concluded was against the public interest."  *Ry-Tan*, 93 P.3d at 1110 (citing *Linan-Faye*, 49 F.3d at 923).  "After World War II, the federal government began to apply termination for convenience to peacetime non-military procurement for the same fundamental purpose—to reduce the government's liability for a breach of contract by allocating to the contractor a share of the risk of an unexpected change in circumstances."  *Id.*  In *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed. Cir. 1988), the Federal

Circuit stated that "termination for convenience, whether actual or constructive, is not of unlimited availability to the government, [and] that it is not an open license to dishonor contractual obligations."  It is true that courts impose reasonable limitations on the use of termination for convenience clauses in government contracts, which includes a "general requirement that the doctrine only be invoked in situations when a change occurs from the circumstances of the bargain or in the expectations of the parties." *Ry-Tan*, 93 P.3d at 1112 (citing *Linan-Faye*, 49 F.3d at 924).

In *CMS Mechanical Services*, the sole Arizona District Court case on point, the Court describes termination for convenience clauses as historically existing "in contracts between the government and private contractors," but "[n]ow the phrase has made its way into private contracts" with very limited authority addressing such situations.  2018 WL 1586647, at *15 (internal citation omitted); *see also SAK & Assocs., Inc. v. Ferguson Const., Inc.*, 357 P.3d 671, 674 (Wash. Ct. App. 2015).  Given the lack of authority, the Court looked to the plain terms of the contract, noting that "nothing indicates the parties understood and intended to imbue the [termination for convenience clause] with any specialized meaning beyond their plain meaning." *Id.*

Kumpers contention that Arizona has adopted the changed circumstances test, as recognized in *Davidson Oil*, 624 F. Supp. 3d at 1250, is incorrect.  In its argument, Kumpers craftily omitted that *Davidson Oil* relies on *Ry-Tan*, in which the Arizona Court of Appeals discussed the requirements of termination for convenience as it relates to contracts between the government and a private party—not agreements between two private parties. *See id.*  At bottom, no locatable Arizona case delineates a changed circumstances requirement for invoking a termination for convenience clause in a contract between two private parties. *Cf. CMS Mech. Servs.*, 2018 WL 1586647, at *15 (noting the lack of authority before relying on the contract's plain language to discern the meaning of a termination for convenience clause).  Therefore, the Court finds that changed circumstances is not a condition precedent for a private contractor to terminate a contractual agreement with another private contractor.

The parties have found common ground with respect to good faith. That is, both parties agree that a contract under Arizona law "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Ariz. Towing Pros.*, 993 P.2d at 1041 (finding that the government did not act in good faith when it invoked a termination for convenience clause to moot an appeal of another contracting party); *see also Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). This covenant requires each party "to refrain from any action which would impair the benefits which the other had the right to expect from the contract or contractual relationship." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). A party can breach the implied covenant "both by exercising express direction in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonable expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. Ct. App. 2002). The Court agrees that a good faith duty exists in all contracts formed under Arizona law. Although, it does not agree that "good faith" is a condition precedent to terminating for convenience.

Parties to a contract must not exercise an express contractual right in a way that breaches the covenant of good faith and fair dealing. *Kuehn v. Stanley*, 91 P.3d 346, 354 (Ariz. Ct. App. 2004). Yet parties to a contract often do just that, resulting in breach of contract claims seeking money damages. *See, e.g.*, *Keg Rest. Ariz., Inc. v. Jones*, 375 P.3d 1173, 1186 (Ariz. Ct. App. 2016); *CMS Mech. Servs.*, 2018 WL 1586647, at *14. No case that Kumpers offers, however, shows that good faith is a condition precedent to invoking a termination for convenience clause. *See, e.g.*, *Arizona Boyz Towing & Transp. LLC v. Town of Gilbert*, CV-18-02057-PHX-JZB, 2019 WL 652857, at *7 (D. Ariz. Feb. 15, 2019); *Wells Fargo Bank*, 38 P.3d at 28; *Calhoun v. Allstate Ins. Holdings LLC*, CV-19-04932-PHX-SRB, 2021 WL 1916838, *6 (D. Ariz. Apr. 12, 2021). This makes sense because requiring as much would ostensibly relieve plaintiffs of their burden at trial to prove that a defendant did not act in good faith. Instead, to treat good faith as such a

condition would place the onus on defendants to prove good faith existed to act in the first instance. Thus, good faith cannot be a condition precedent to termination for convenience. Instead, parties risk running the gamut of litigation if their exercise of an express contractual right is believed by another to violate the ever present Arizona covenant of good faith. *See Keuhn*, 91 P.3d at 354; *Ariz. Towing Pros.*, 993 P.2d at 1041; *Calhoun*, 2021 WL 1916838, at *6.

Therefore, the Court will deny Kumpers' Motion to the extent it asks the Court to find changed circumstances and good faith to be conditions precedent to terminating for convenience.

### 3.  TPI's Affirmative Defenses

Next, Kumpers moves for summary judgment on several of TPI's affirmative defenses. (Doc. 78 at 1.)

Kumpers argues that most, if not all, of TPI's affirmative defenses fail because they are legally deficient, lack factual support, or both. (Doc. 78 at 13.) TPI asserted the following affirmative defenses in its Answer: (1) failure to state a claim upon which relief may be granted; (2) inability to prove essential elements of the claims asserted; (3) Count III (breach of contract) fails as there was no meeting of the minds and the terms are indefinite; (4) statute of frauds; (5) Kumpers' damages, if any, are self-inflicted; (6) failure to mitigate damages; (7) and estoppel, waiver, and/or unclean hands. (*See* Doc. 71 at 9–10 ¶¶ 1–9.)

Here, TPI concedes that affirmative defenses (1) and (5) are not applicable, and thus the Court will enter summary judgment against them. (Doc. 90 at 10 n.3.) Additionally, TPI concedes that defenses (2) and (3) are not per se affirmative defenses, but regardless, it should have the ability to raise the issues at trial to defeat Kumpers' claims. (*Id.* at 12–14.) The Court agrees. Both defenses (2) and (3) are not affirmative defenses, they assert defects in Kumpers' prima facie case. *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense"); *Smith v. North Star Charter Sch., Inc.*, No. Civ.

1:10-618 WBS, 2011 WL 3205280, at *2 (D. Idaho July 26, 2011) (holding that purported defenses that "amount only to assertions that plaintiffs failed to state a claim" are not proper affirmative defenses); *see also Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App 2004) ("[T]he plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages."). Kumpers has not moved for summary judgment on the merits of any claim. Thus, granting summary judgment on whether Kumpers can prove the elements of its claim is outside the scope of the Motion. Though, summary judgment will be entered, however nominal it may be, against affirmative defenses (2) and (3) insofar as they fail as affirmative defenses. The remaining affirmative defenses are (4) statute of frauds, (6) failure to mitigate damages, and (7) estoppel, waiver, and/or unclean hands.

### i.      Statute of Frauds

The Court previously determined that the CISG governs the contract in this case. *See* CISG art. 4. A material difference between the CISG and Arizona law is that the CISG does not include a statute of frauds. *See* CISG art. 11; *Urica, Inc. v. Pharmaplast S.A.E.*, 2014 WL 3893372, at *11 (C.D. Cal. Aug. 8, 2014) ("[T]here is no statute of frauds requiring that all material[] contract terms be in writing" under the CISG), *aff'd sub nom. Urica, Inc. v. Medline Indus., Inc.*, 669 F. App'x 421 (9th Cir. 2016).[5] The CISG states that a "contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be provided by any means, including witnesses." CISG art. 11. The CISG, therefore, preempts the application of Arizona's statute of frauds, rendering it an unavailable affirmative defense in this case. *See, e.g.*, *Textmont Design Ltd. v. Halston Operating Co.*, CV 18-10164-CJC (GSJx), 2023 WL 4843078, at *2 (C.D. Cal June 21, 2023) (finding that the statute of frauds affirmative defense is irrelevant and inadmissible when the CISG applies).

### ii.      Failure to Mitigate Damages

Under the CISG and Arizona law, a defendant carries the burden to prove that the

---

[5] Additionally, neither the United States nor Germany have made a reservation under CISG art. 96 to prevent CISG art. 11 from preempting the statute of frauds.

party asserting a breach failed to take reasonable measures to mitigate damages. *See* CISG art. 77 ("A party who relies on a breach of contract must take such measures as are reasonable in the circumstances to mitigate the loss, including loss of profit, resulting from the breach. If he fails to take such measures, the party in breach may claim a reduction in the damages in the amount by which the loss should have been mitigated."); *W. Pinal Family Health Ctr., Inc. v. McBryde*, 785 P.2d 66, 68 (Ariz. Ct. App. 1989) ("A basic principle of the law of damages is that one who claims to have been injured by breach of contract must use reasonable means to avoid or minimize the damages resulting from the breach."); *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 603 P.2d 513, 526–27 (Ariz. Ct. App. 1979) (explaining that the defendant who breached the contract "ha[d] the burden of proving that mitigation was reasonably possible but not reasonably attempted"); *Wells Fargo Bank*, 38 P.3d at 29 ("[T]he remedy for breach of the implied covenant [of good faith and fair dealing] is an action for breach claiming contract damages.").

Kumpers argues that TPI "has not come forward with any admissible evidence on the issue of failure to mitigate damages." (Doc. 78 at 14.) In response, TPI contends that ruling on mitigation is premature, partly because Kumpers has not moved for summary judgment on its claims or damages. (Doc. 90 at 15.) Additionally, TPI argues that it produced ample evidence, including expert reports, emails, and deposition testimony, to establish a genuine dispute of fact about Kumpers' efforts to mitigate. (Doc. 90 at 15–16.) In reply, Kumpers argues that evidence is either inadmissible or insufficient to establish a dispute of fact. (Doc. 106 at 9–10.) Kumpers also contends that, because TPI only provides evidence to combat Kumpers' alternative breach of contract claim (Count VI), (Doc. 66 at 12–14 ¶¶ 84–92), it is entitled to summary judgment on the mitigation defense on Counts I through V in the First Amended Complaint, (Doc. 106 at 9).

The Court first addresses two technical matters put forth in the parties' respective arguments. To quell TPI's concerns about prematurity, summary judgment may be directed at "each claim or defense." Fed. R. Civ. P. 56(a). Recognizing as much, other district courts have decided the sufficiency of a failure to mitigate defense on summary

judgment.  *See In re 3M Combat Arms Earplug Prod. Liability Litig.*, 2023 WL 5670825, *1 (N.D. Fla. July 5, 2023) (ruling on a failure to mitigate affirmative defense at summary judgment); *but see See Mastec N. Am., Inc. v. Coos Cnty.*, No. 04-278-AA, 2007 WL 2027011, at *8 (D. Or. July 6, 2007) (remarking that when proffered evidence runs afoul of Federal Rule of Evidence 408, the sufficiency of a mitigation of damages defense is better "raised a motion in limine rather than a motion for summary judgment"); *Roadbuilders Machinery Supply Co., Inc. v. Sandvik Mining and Constr. USA, LLC*, 723 F. Supp. 3d 989, 1005–06 (D. Kan. 2024).  Next, the Court does not agree that Kumpers is entitled to summary judgment on the failure to mitigate defense for Counts I through V because Kumpers perceived TPI's defense as targeting only Count VI.  (*See* Doc. 106 at 9; Doc. 66 at 12–14 ¶¶ 84–92.)  The Court will, therefore, consider whether TPI's arguments and evidence of the defense create a genuine dispute of fact regarding each claim in the First Amended Complaint.

TPI adduces evidence to ward off summary judgment on its failure to mitigate damages defense for Counts II, IV, and VI.  (*See* Doc. 90 at ¶¶ 28–33, 8–9 ¶¶ 35–50, 9 ¶ 47; Doc. 91-3 at 4–6; Doc. 91-9 at 2; Doc. 91-10.)[6]  The damages alleged under these Counts include past, present, and future lost profits from the termination of the Supplier Agreement and non-performance of the Master Agreement.  (*See* Doc. 66.)  TPI posits that the evidence it produced creates a genuine question of fact regarding whether Kumpers unreasonably delayed a potential settlement under Section U.1 of the Master Agreement.

The settlement agreement sought €4,215,512.50 for the outstanding 182 MT of UD600 that TPI had not yet purchased.[7]  (Doc. 91-6 at 3.)  TPI states that it paid €20.55

---

[6]  TPI offers a rebuttal expert report in which the expert opines that Plaintiff has not adequately mitigated its damages or accounted for costs arising out of the alleged breach. (*See* Doc. 91-3.)  Plaintiff, however, contends that the Court may not consider the expert report because it is unsworn.  (Doc. 106 at 10); *see also Shuffle Master, Inc. v. MP Games LLC,* 553 F. Supp. 2d 1202, 1210 (D. Nev. 2008) ("It clearly follows, and is well established, that an unsworn expert report is inadmissible" to support summary judgment). Regardless, as the Court will explain, TPI has produced sufficient evidence to create a genuine dispute of material fact to sustain the defense on Counts II, IV, and VI.
[7]  Kumpers' settlement agreement calculated approximately 8000 kilograms of waste and machine set up, bringing the total weight to 190,985 kilograms of raw material.  (Doc. 91-6 at 3.)

per kilogram in the fourth quarter of 2022 and first quarter of 2023, so the outstanding amount should have totaled around €3,740,100.00.  (Doc. 91 at 7 ¶¶ 30–31.)  Making matters more interesting, Kumpers may not have been able to supply the outstanding 182 MT when it proffered the settlement agreement.  Kumpers continued to purchase large quantities of raw carbon from SGL at the end of 2022.  (Doc. 91-4 at 3 ¶ 11; 91-7; Doc. 91-9; Doc. 91-10; Doc. 82-4 at 61–62; Doc. 91 at 8–9 ¶¶ 42–50.)  Between September and December, Kumpers had ordered approximately 220 MT of raw carbon.  (Doc. 91-9 at 2.)  By January or February 2023, Kumpers began liquidating its UD 600 supply to seemingly mitigate loss from TPI's termination, which left Kumpers with 44 MT on hand at the time it made the settlement offer.  (*See* Doc. 91 at 7–8 ¶¶ 32–34; Doc. 91-8 at 15–17; Doc. 9-9 at 2.)  Additionally, Kumpers did not attempt to cancel its December 2022 raw carbon order after TPI terminated the Supply Agreement on December 22, 2022.  (*See* Doc. 91-4 at 3 ¶ 11.)  Nor did Kumpers seek to return the raw material, citing a "standard in the industry" shunning such practice.  (*Id.* ¶ 10.)  And although Kumpers testified that it sold roughly 92 to 125 MT of the 160 MT of raw material on the spot market, Kumpers did not reduce the damages it now seeks to account for the revenue generated by repurposing or selling the raw material.  (*Id.* at 4 ¶ 14; Doc. 91-8 at 15–17.)

Construing the in evidence in the light most favorable to TPI, the nonmoving party, while also being mindful of TPI's burden to prove its defense, shows a genuine dispute of fact over whether Kumpers impeded the settlement by making a demand that exceeded its reasonable costs.  (*See* Doc. 91 at 7–8; Doc. 90 at 16; *see also* Doc. 91-6; Doc. 91-7; Doc. 82-3 at 14.)  Kumpers submits that the evidence showing it liquidated overstocked material demonstrations that it took reasonable steps to mitigate damages—but this position does not account for its inflated demand for costs accumulated and claimed for raw material.  Thus, the Court will deny summary judgment against TPI's failure to mitigate damages defense as to Counts II, IV, and VI.

Regarding Count I, the Court is unsure how the evidence shows that Kumpers failed to mitigate its damages after TPI breached the parties' non-disclosure agreement ("NDA").

Kumpers alleges the breached occurred when TPI shared Kumpers' pricing information to receive a better price for UD600 from other entities, including Metyx and Zoltek. (Doc. 66 at 7 ¶¶ 45–46.) The evidence TPI offers generally evidences damages relevant to the mitigation efforts under the Agreements, not the NDA. (*See* Doc. 90 at 16; Doc. 91 at 6–9.) Therefore, without more, TPI has failed to establish a dispute of fact regarding its mitigation defense as it relates to Count I.

Likewise, TPI has failed to put forth evidence regarding Kumpers' failure to mitigate the damages flowing from its breach of contract claim (Count III) and promissory estoppel claim (Count V)[8] centered around the alleged 2023 contract. In Count III, Kumpers alleges that it suffered damages as a result of TPI breaching the 2023 volume contract. (Doc. 66 at 9 ¶¶ 59–64.) In Count V, Kumpers alleges that at the time "TPI made the promises, it reasonably knew would induce Kumpers to incur costs (e.g. signing a lease and committing to purchase certain minimums from its supplier SGL), pass up other opportunities, and induce Kumpers to perform work with and sell product to TPI." (*Id.* at 11–12 ¶ 77.) The evidence TPI offers shows potential reasonable mitigation efforts with respect to the breaches of the Supplier and Master Agreements. Kumpers stopped receiving raw materials after March 2023 and continued to liquidate its remaining stock. (*See* Doc. 91-7 at 2.) Or, in other words, Kumpers was affirmatively mitigating the losses it suffered due to TPI not following through on the 2023 contract.

Because TPI carries the burden at trial, and therefore the burden to support the defense on summary judgment, the lack of evidence showing Kumpers' methods of mitigating damages was unreasonable dooms TPI's defense as to Count III and V. Therefore, the Court will enter summary judgment against the mitigation of damages

---

[8]  Under the CISG, mitigation of damages is a defense to breach of contract, however, its provisions are silent about the defense's applicability on claims for promissory estoppel. See CISG art. 77. To fill the gap, Arizona law guides that "[a] promissory estoppel claim is not the same as a contract claim. Promissory estoppel provides an equitable remedy and is not a theory of contract liability." *Double AA Builders*, 114 P.3d at 843; *see also Chewning v. Palmer*, 650 P.2d 438, 440 (Ariz. 1982) (distinguishing "equitable remedy under the theory of promissory estoppel" from breach of contract); *State ex rel. Romley v. Gaines*, 67 P.3d 734, 739 (Ariz. Ct. App. 2003) (stating that promissory estoppel is not a theory of contract recovery). That aside, however, TPI has not offered evidence to show how Kumpers failed to mitigate its damages related to its promissory estoppel claim.

1    defense as it relates to Count III and V.

2        In sum, the Court finds a genuine dispute of material fact exists with respect to

3    whether Kumpers took reasonable measures to mitigate its damages regarding Counts II,

4    IV and VI.  Therefore, the Court will deny summary judgment on the affirmative defense

5    of mitigation of damages as to those Counts.  However, finding either factual or legal

6    insufficiencies with the defense in relation to Counts I, III, and V, the Court will grant

7    summary judgment on those Counts.

8                    *iii.*            *Estoppel, Wavier, and Unclean Hands*

9        Next, Kumpers argues that TPI's estoppel, wavier, and unclean hands defenses fail

10   for want of admissible evidence.  (Doc. 78 at 14.)  In response, TPI argues that it has

11   provided evidence to sustain each defense.  (*See* Doc. 90 at 16–18.)

12       The CISG is silent regarding estoppel, wavier, and unclean hands.  Therefore,

13   Arizona law controls.  *See Maxxsonics*, 2012 WL 962698, at *7.  TPI holds the burden of

14   proof, as it is the party asserting these defenses.  *See Valencia Energy Co. v. Ariz. Dept. of*

15   *Revenue*, 959 P.2d 1256, 1268 (Ariz. Ct. App. 1998) (estoppel); *Am. Cont'l Life Ins. Co.*

16   *v. Ranier Const. Co.*, 607 P.2d 372, 374 (Ariz. 1980) (waiver); *Tripati v. Ariz. Dept. of*

17   *Corr.*, 16 P.3d 783, 786 (Ariz. Ct. App. 2000) (unclean hands).

18       The Court will first discuss estoppel and waiver.  The three elements of estoppel

19   are: "(1) the party to be estopped commits acts inconsistent with a position it later adopts;

20   (2) reliance by the other party; and (3) injury to the latter resulting from the former's

21   repudiation of its prior conduct."  *Valencia Energy*, 959 P.2d at 1267–68.  "Reliance"

22   means that the party seeking estoppel "prospectively relied" on the other party's action.

23   *See id.* at 1268.  "Injury" requires a defendant to show "substantial detriment to the party

24   resulting from a repudiation of prior representations," such as a "positional change not

25   compelled by law."  *See id.* ("[N]o detriment is incurred when the party's only injury is

26   that it must pay taxes legitimately owed under the correct interpretation of the law.").

27   "Waiver is either the express, voluntary, intentional relinquishment of a known right or

28   such conduct as warrants an inference of such an intentional relinquishment.  Waiver by

conduct must be established by evidence of acts inconsistent with an intent to assert the right." *Am. Cont'l Life Ins.*, 607 P.2d at 374.

TPI seemingly directs its estoppel and waiver defenses at Kumpers' allegations that the December 2022 termination notice was legally deficient under the terms of the parties' Agreements. (Doc. 90 at 17.) Thus, the interpretation of the Master and Supplier Agreements is part and parcel of TPI's estoppel and waiver defenses.[9] Indeed, the meaning of the Master Agreement's Section V "Notices" provision (the "Notice Clause") will inform whether TPI's email-noticed termination of the Agreements was sufficient, and thus whether Kumpers can now be estopped from claiming otherwise or waived its claim under Section V's plain language. If a contractual term is ambiguous, i.e., its meaning is subject to more than one reasonable interpretation, then the interpretation of such term is a question of fact for the jury. *Focus Point Prop., LLC v. Johnson*, 330 P.3d 360, 367 (Ariz. Ct. App. 2014); *see also BP Oil*, 332 F.3d at 336. Section V maintains that all notices, which contemplates notice of termination for convenience, must be:

> [I]n writing and be delivered to the parties at the addresses as set forth on the PO or any other address that a party may designate by notice to the other party. Notices are considered delivered upon actual receipt if delivered personally or by fax or an overnight delivery service, and at the end of the third business day after the date of deposit in the United States mail, postage pre-paid, certified, return receipt requested.

(Doc. 79 at 12.)

It is undisputed that TPI had not received any hard copy letter from Kumpers via the United States Postal Service or any other courier prior to January 2023. (Doc. 82 at 9 ¶ 60–61; Doc. 105 at 11 ¶ 1; Doc. 82-1 at 16–17 ¶¶ 34–35.) Or, in other words, the parties regularly transacted business through email. (Doc. 82 at 9 ¶ 61.) However, Kumpers maintains that it "did not expressly nor impliedly agree to notice by email because the December 2022 termination notice was the only 'notice' ever sent by either party that was required by the Master Agreement." (Doc. 97-1 at 7 ¶ 39.) Thus, according to Kumpers,

---

[9] In its analysis of TPI's Motion for Partial Summary Judgment, the Court finds that the parties' Agreements have derogated application of Article 8's contractual interpretation provisions. Therefore, those provisions are not considered in the determination of the sufficiency of TPI's defenses.

the notice required under Section V cannot be transmitted through email. Because the parties have different reasonable interpretations of the meaning of the "writing" and "addresses" requirements in the Notice Clause, the question of what notice was required must proceed to the jury. *See BP Oil*, 332 F.3d at 336. Based on the facts and the parties' arguments, the Court finds that a genuine question of fact exists regarding the Notice Clause, as it is subject to more than one reasonable interpretation.

Because a genuine question of material fact exists regarding what the Notice Clause requires, an additional question exists with respect to whether Kumpers waived that requirement by using methods other than the written physical mail in its email notices, requests, or demands directed at TPI. If a jury finds that the Notices clause contemplates email as a sufficient writing and place of delivery, then the jury may find that TPI properly noticed its termination of the Supplier Agreement in December 2022. In that scenario, waiver is not a sustainable defense. *See* CISG Opinion No. 1, cmt. 13.2 (Aug. 15, 2003) ("The parties may agree on what type of written form they intend to use. They may, for instance, agree that they only accept paper letters sent by a particular courier service. Unless the parties have limited the notion of writing, there should be a presumption that electronic communications are included in the term 'writing.' This presumption could be strengthened or weakened in accordance to the parties' prior conduct or common usages." (internal citations omitted)). However, if a jury instead finds that the Notices clause required physical mail, but the parties' established email notice as a common practice, then the jury may find that Kumpers waived its right to assert that the December 2022 termination email constituted improper notice. *See* CISG art. 9; *Am. Cont'l Life Ins.*, 607 P.2d at 374 ("Waiver by conduct must be established by evidence of acts inconsistent with an intent to assert the right.").

In sum, because there exists a genuine dispute over the requirements under the Notices clause, a genuine dispute over whether Kumpers waived its right to assert improper notice also exists. Therefore, the Court will deny summary judgment against TPI's waiver defense.

Regarding estoppel, TPI argues that even if the Court finds TPI's notice to be deficient under the Master Agreement, Kumpers should be estopped from asserting that failure to adhere to the contractual terms breached the contract. (Doc. 90 at 17.) Mr. Shyne's acknowledgment regarding receipt of the termination may satisfy the first estoppel element, however, TPI has not sufficiently shown how it relied upon Mr. Shyne's statements to the point of injury. *See Valencia Energy*, 959 P.2d at 1267–68. Indeed, Mr. Shyne stated that he would "respond in due course[,]" (Doc. 82-1 at 22), which evidently did not foreclose the possibility that Kumpers would respond with a breach of contract lawsuit asserting noncompliance with the Notice Clause. Without having provided case law or record citations that cognize this type of reliance and harm, TPI's estoppel defense is either inapposite or simply unsubstantiated. Therefore, the Court will grant summary judgment on TPI's estoppel defense.

"Unclean hands" is "an equitable defense to a claim seeking equitable relief." *Tripati*, 16 P.3d at 786. The doctrine "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 980 F.2d 165, 173 (9th Cir. 1989). A defendant asserting unclean hands must establish (1) "that the plaintiff's conduct is inequitable," and (2) "that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

TPI raises its unclean hands defense against Kumpers' promissory estoppel claim. Therein, Kumpers alleges, among other things, that "TPI made promises to Kumpers to purchase a minimum of 700 metric tons of materials" and that TPI would purchase "55% of [its 2023] product requirements . . . [from] Kumpers." (Doc. 66 at 11 ¶ 76.) Moreover, Kumpers alleges that "TPI knew at the time of making those promises it would induce Kumpers to incur costs (e.g. signing a lease and committing to purchase certain minimums from its supplier SGL), pass up other opportunities, and induce Kumpers to perform work with and sell product to TPI." (*Id.* at 11–12 ¶ 77.)

In TPI's view, Kumpers obtained the promise upon which its claim rests by misrepresenting certain material facts about the urgent nature of the Lathen plant's lease extension. (Doc. 90 at 18.) Specifically, TPI argues that Mr. Younes' deposition testimony, weighed alongside Kumpers' lease addendum, shows that Kumpers exercised its option to extend its lease on March 20, 2022, before TPI's alleged April 2022 promise to continue working with Kumpers in 2023. (*Id.*) Therefore, the doctrine of unclean hands prevents the recovery of damages from any purported reliance on said promise. (*Id.*) In reply, Kumpers argues that TPI did not previously disclose that its unclean hands defense was directed at its promissory estoppel claim and TPI should therefore be barred from asserting it. (Doc. 106 at 10.)

As an initial matter, Kumpers does not cite legal authority prohibiting a previously undisclosed argument regarding an asserted defense from being argued at summary judgment. The Court will not grant summary judgment on that ground alone. With respect to the substance of TPI's unclean hands argument, the Court cannot consider the lease addenda provided in German nor the unofficial translation, as they are inadmissible under the rules of evidence. *See* Fed. R. Evid. 901(a); *Wis. Province of Soc'y of Jesus v. Cassem*, 486 F. Supp. 3d 527, 532 n.4 (D. Conn. 2020) ("It is well established that foreign language materials are inadmissible in the absence of an English translation certified to be true and accurate."). However, some weight ought to be afforded to Mr. Younes' deposition testimony, as Mr. Younes is fluent in German and English, and no party offers argument that his informal translation of the documents is inaccurate. *Cf. Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 (SRN/SER), 2014 WL 12598867, at *6 (D. Minn. April 15, 2014).

It is unclear from Mr. Younes' deposition testimony how the lease extension was facilitated, though he does not necessarily deny that the lease extension, or at least a discussion of the extension, took place on March 30, 2022. (Doc. 82-1 at 59–60; *see also id.* at 56–59.) When first asked whether Kumpers had extended the lease agreement by the March 31 deadline, Mr. Younes testified that he did not know. (*Id.* at 59.) When shown

the "May 2022 lease addendum," Mr. Younes, translating the document from German to English, testified that it signified that Kumpers "from the 30th of March 2022, from the option to the rental acceleration, extension, until the 31st of December, 2022 . . . [i]t has been extended until first of -- first one of December 2023." (*Id.* at 59–60.) If Kumpers used the lease issue as a false pretense to secure a future volume commitment from TPI, then the doctrine of unclean hands may preclude recovery. This possibility, which Mr. Younes' testimony potentiates, is a genuine dispute of material fact to be determined at trial. Thus, the Court will deny summary judgment against TPI's unclean hands defense.

At bottom, the Court will grant in part and deny in part Kumpers' Motion for Summary Judgment.

**B.    TPI's Motion for Partial Summary Judgment**

TPI moves for summary judgment on Counts II, III, and V asserted in Kumpers' First Amended Complaint. (Doc. 81 at 2.)

1.    The Merger Clause

Before reaching the substance of TPI's arguments, the Court addresses an issue raised in Kumpers' Response and TPI's Reply. Kumpers argues that under the CISG provisions for contract interpretation, the Court must consider extrinsic evidence to discern the parties' intent with respect to the terms of the Agreements. (Doc. 97 at 12–15.) In turn, TPI contends that the "entire agreement" clause (the "Merger Clause") in the Supplier Agreement expressly precludes the use of extrinsic evidence to supplement unambiguous terms in the Agreements. (Doc. 110 at 6–8.)

The CISG allows contracting parties to fashion their agreements to exclude certain treaty provisions. *See* CISG art. 6; *see also* CISG Opinion No. 1, cmt. 13.2 (citing CISG art. 6 for the proposition that "[t]he parties may agree on what type of written form they intended to use"). Contrary to practices in United States courts, the CISG's canons of interpretation commands courts to engage in an extensive inquiry into the parties' subjective intent, regardless of whether a contractual term is ambiguous. *See* CISG art. 8(3) ("[D]ue consideration is to be given to all relevant circumstances of the case including

the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties."); *see also* CISG Opinion No. 3, § 4.6 ("[A] Merger Clause may prevent recourse to extrinsic evidence . . . if specific wording, together with all other relevant factors, make clear the parties' intent to derogate from Article 8 for purposes of contract interpretation."); *see also MCC-Marble Ceramic Ctr. Inc., v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1387 (11th Cir. 1998); *accord Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.*, 521 F. Supp. 2d 1153, 1166 (D. Kan. 2007). Article 8's edict is especially oppressive in common law jurisdictions because the CISG has not incorporated the parol evidence rule, the plain meaning rule, or a simple means to give effect to a Merger Clause. *See* CISG Opinion No. 3, §§ 2–4. Although, contracting parties may include a Merger Clause in their agreements to evidence "a valid and enforceable expression of [their] intent to derogate from the expansive contract interpretation principles embodied in Article 8 of the CISG. *Caffaro Chimica S.r.l v. Sipcam Agro USA*, No. 1:07-CV-2471-MHS, 2008 WL 11407388, *5 (N.D. Ga. Jul. 15, 2008). When faced with a merger clause, the Advisory Council has explained that:

> [E]xtrinsic evidence should not be excluded, unless the parties actually intended the Merger Clause to have this effect. The Question is to be resolved by reference to the criteria enunciated in Article 8, without reference to national law. Article 8 requires an examination of all relevant facts and circumstances when deciding whether the Merger Clause represents the parties' intent.

CISG Opinion No. 3, § 4.5. In other words, to discern whether a Merger Clause has the effect of excluding extrinsic evidence, courts must look to extrinsic evidence. Albeit counterintuitive, and certainly suspect under the traditions of American contract law, the Court will not vitiate its obligation to consider extrinsic evidence of the Merger Clause simply because doing so is infelicitous to general principles of contractual interpretation.

The Supplier Agreement's Merger Clause provides that it "constitutes the entire agreement between [Kumpers] and TPI regarding the sale and purchase of Products and supersedes all prior agreements, negotiations and discussions, written or oral, and there are no additional terms or understandings." (Doc. 79 at 20.)

Kumpers contends that "any determination regarding the intent of the parties, including in respect to the effect of the merger clause, is improper for summary judgment." (Doc. 97 at 14.)  Kumpers' argument is mainly supported by a citation to ¶¶ 3–17 of its Separate Statement of Facts.  (*See* Doc. 105.)  Combing through the cited paragraphs and the included citations to the record does not reveal any discussion between the parties with respect to the Merger Clause in the Supplier Agreement.  Much of the relevant extrinsic evidence the Court has reviewed concerns TPI's negotiations with Kumpers to secure the 700 MT UD600 volume under the Supplier Agreement at a price favorable to TPI.  (*See* Doc. 105 at 2–6 ¶¶ 3–17.)  Thus, it is unclear what extrinsic evidence Kumpers wishes the Court to consider when weighing the effect of the Merger Clause.

TPI provides several drafts of the Supplier Agreement it exchanged with Kumpers during negotiations.  (*See* Doc. 82-2 at 3–5 ¶¶ 13–21, 28–37 (November 14, 2021 draft created by TPI), 51–57 (November 17, 2021 edits by Kumpers), 73–82 (December 9, 2021 edits by Kumpers), 99–104 (December 16, 2021 edits by Kumpers).)  Additionally, TPI's draw the Court's attention to several email threads showcasing communication between TPI and Kumpers regarding the Supplier Agreement.  (*See generally id.*)  Nowhere in those drafts or emails does Kumpers or TPI attempt to alter the Merger Clause.  (*See, e.g.*, *id.* at 39, 51–61, 63, 73–81, 84, 99–108, 110.)   Thus, no discussion of the Merger Clause, including the intent of the parties as to its meaning or effect, is contained in the offered parts of the record.  (*See id.*); *see also TeeVee Toons*, 2006 WL 2463537, at *8–9 (finding a genuine dispute of material fact where there was evidence of a "prior oral agreement to disregard boilerplate language . . . [including] a merger clause"); *MCC-Marble*, 144 F.3d at 1391& n.19 (explaining that, in a case where the a merger clause was absent, "to the extent the parties wish to avoid parol evidence problems they can do so by including a merger clause . . . that extinguishes any and all prior agreements and understandings not expressed in the writing").

Deciding the effect of a Merger Clause in light of CISG Article 8 is proper on summary judgment.  *See TeeVee Toons*, 2006 WL 2463537, at *8; *cf. Shanghai Fortune*

1   *Chem. Co. v. PMC Specialities Grp., Inc.*, 2012 WL 13018599, *3 (S.D. Ohio Mar. 20,

2   2012) (finding it "premature" to make a determination regarding the intent of the parties

3   regarding a Merger Clause prior to the close of discovery).  As noted, the record is devoid

4   of evidence of negotiations, discussion, or other agreements showing the parties' intent

5   regarding the Merger Clause.  (*See generally* Doc. 82-2.)  The only evidence that seemingly

6   exists to show the parties' intent is the Merger Clause itself.  *See Caffaro Chimica*, 2008

7   WL 11407388, at *5.  Although Kumpers blanketly labels the terms of the Suppler

8   Agreement "ambiguous," it does not sufficiently argue why the Merger Clause is the

9   subject of any ambiguity.  Certainly, the clause itself is exceedingly clear: "[it] constitutes

10  the entire agreement between [Kumpers] and TPI regarding the sale and purchase of

11  Products and supersedes all prior agreements, negotiations and discussions, written or oral,

12  and there are no additional terms or understandings."  Applying the CISG principles to the

13  Merger Clause and construing the facts in favor of Kumpers, the non-moving party, the

14  Court finds that the Merger Clause derogates CISG article 8 and bars consideration of

15  "prior agreements, negotiations, and discussions, written or oral" for purposes of contract

16  interpretation.[10]  (*See* Doc. 79 at 20); *Caffaro Chimica*, 2008 WL 11407388, at *5 ("Giving

17  effect to the merger clause necessarily derogates from a mode of contract interpretation

18  that would allow for the integration of new or conflicting terms into the Supply Agreement.

19  Lest the merger clause have no meaning whatsoever.").[11]

20      Because the parties have derogated Article 8's application, the Court will use

21  general principles of contractual interpretation when tasked with discerning contractual

22  meaning.  In Arizona, "[a] general principle of contract law is that when parties bind

23  themselves by a lawful contract, the terms of which are clear and unambiguous, a court

---

[10]  It is prudent that the Court discuss the near identical Merger Clause in the Master Agreement.  (*See* Doc. 79 at 7–13.)  The Master Agreement contains a similar insulating clause to which the parties adduce no evidence of intent other than the writing itself.  (*Id.* at 12.)  And, again, the plain language of the Master Agreement makes exceeding clear that extrinsic evidence ought not be considered to explain the terms of the Agreement.  (*Id.*)

[11]  The Advisory Council has noted that even when a Merger Clause excludes extrinsic evidence—i.e., derogates Article 8—Article 9 will otherwise allow extrinsic evidence of "established practices concerning the implicit background of the transaction unless those usages and practices are specifically mentioned."  *See* CISG Opinion No. 3.

must give effect to the contract as written." *Grubb & Ellis Mgmt. Serv., Inc.* v. *407417 B.C., L.L.C.*, 138 P.3d 1210, 1213 (Ariz. Ct. App. 2006); *Mining Inv. Group, L.L.C. v. Roberts*, 177 P.3d 1207, 1211 (Ariz. Ct. App. 2008) ("Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto.").

### 2.    Breach of Contract (Count II)

Kumpers asserts a breach of contract claim based on TPI's termination of the Supplier Agreement. (Doc. 66 at 8.) To support its claim, Kumpers contends that TPI's invocation of the termination for convenience clause was not in accordance with the express or implied terms of the Supplier Agreement. (*Id.* ¶¶ 54–56.) In its Motion for Partial Summary Judgment, TPI asserts that it was entitled to terminate for convenience under the terms of the Master Agreement, as its terms also controlled the Supplier Agreement. (Doc. 81 at 9–11.) In response, Kumpers contends that TPI lacked the right to terminate for convenience and improperly noticed the termination. (Doc. 97 at 16–19.)

#### i.    *TPI's Right to Terminate for Convenience*

As discussed, the parties agree that the CISG does not govern termination for convenience clauses and therefore Arizona law applies. Moreover, the Court has determined that the Master and Supplier Agreements are incorporated to the extent that the Agreements do not specifically provide otherwise, and that the Merger Clause insulates the Agreements from extrinsic evidence regarding the parties' intent under CISG Article 8. As a result, the Court's task is to determine whether the termination for convenience clause is unambiguous. If it is unambiguous, the question becomes whether TPI had the right to exercise that clause. On that point, TPI asks the Court is to find that the exercise of that clause, as an express contractual right, could not have breached the parties' contract.

The Court has discussed, at length, the scant case law regarding termination for convenience clauses existing in private contracts. *See CMS Mech. Servs.*, 2018 WL 1586647, at *15; *see also SAK & Assocs.*, 357 P.3d at 674. In the past, this Court looked to the plain terms of the contract to ameliorate this issue, remarking that "nothing indicates

the parties understood and intended to imbue the [termination for convenience clause] with any specialized meaning beyond their plain meaning." *CMS Mech. Servs.*, 2018 WL 1586647, at \*15.

Section U of the Master Agreement states:

> **1. Termination for Convenience.** At TPI's convenience, TPI may terminate this Agreement, a supply agreement and/or a PO by written notice as to all or any part of the Products not delivered, except for any POs for Products that, in good faith, are already in the manufacturing or delivery process (including non-cancellable orders for reasonable quantities of raw materials for which Supplier has no other use), prior to receipt by Supplier of the notice.

(Doc. 79 at 11–12.)

Kumpers argues that the Supplier Agreement does not give TPI the ability to terminate it because that Agreement only references Section U of the Master Agreement to discuss allocation of authority among TPI and its affiliates. (Doc. 97 at 16.) In simpler terms, Kumpers contends that the termination for convenience clause was not incorporated into the Supplier Agreement. (*See id.* at 16–17.) TPI argues that the termination language in both Agreements is unambiguous, and that even if the Court considered extrinsic evidence under Article 8, there is no genuine dispute of material fact that TPI retained the right to terminate for convenience. (Doc. 81 at 9–10; Doc. 110 at 8.)

As an initial matter, no text in either Agreement signifies that the parties ascribed some special or technical meaning to the clause aside from giving TPI the ability to terminate for its own convenience. Thus, bestowing the clause its plain meaning is appropriate. *See CMS Mech. Servs.*, 2018 WL 1586647, at \*15 (determining that a similar clause ought to be given its plain meaning). Additionally, even if the Court was meant to consider extrinsic evidence under Article 8, such proffered evidence does not show that the parties intended for the termination for convenience clause to have any other effect than allowing TPI to terminate for its own convenience. In the Court's view, Section 2.4 of the Supplier Agreement reaffirms the fact that "only TPI can terminate [the Supplier] Agreement pursuant to Section U of the Master Agreement." (Doc. 79 at 16.) Further, even if Section 2.4 only served to express allocation of authority, the Master Agreement

and Supplier Agreements are incorporated, providing control to the Master Agreement so long as the Supplier Agreement does not modify it. (Doc. 79 at 7.) Moreover, the Supplier Agreement does not purport to revoke or abridge TPI's right to exercise its right to terminate. Put simply, the evidence supports finding that TPI retained the right to terminate the "[Master] Agreement, a supply agreement and/or a PO by written notice." (Doc. 79 at 11.)[12] Therefore, the Court finds that TPI retained the right to terminate the Supplier Agreement for convenience.

### ii.    TPI's Compliance with the Notice Clause

The Court previously discussed the Notice Clause in the context of TPI's waiver defense. Much of the same analysis applies here. *See* CISG Opinion No. 1, cmt. 13.2; *see also* CISG art. 9 ("The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves."). Here, the plain text of the Notice Clause provides that all "notices, requests, demands and other communications required by the [Master] Agreement or a supply agreement must be in writing and be delivered to the parties at the addresses as set forth on the PO or any other address that a party may designate by notice to the other party." (Doc. 79 at 12.)

Unsurprisingly, the parties are at odds with respect to what the Notice Clause requires. On one hand, TPI argues that the Notice Clause allows notice by email, and the parties' conduct otherwise shows Kumpers assented to email notice. On the other hand, Kumpers asserts that the Notice Clause clearly demands that notice must be physically mailed to the only address "as set forth on the PO," (Doc. 79 at 12), which was in Germany, (Doc. 105 at 10 ¶ 29). Moreover, TPI maintains that the parties "regularly communicated via email and transmitted formal letters via email," (Doc. 82 at ¶¶ 41, 60–61), and that any breach is a technical, non-material issue considering that Kumpers had notice of the termination and acknowledged receipt, (Doc. 81 at 12). In response, Kumpers contends

---

[12] Plaintiff also contends that Attachment A-1 of the Supplier Agreement lays out specific criteria for TPI to exercise the termination for convenience clause. (Doc. 97 at 17.) This argument is bereft of merit. Attachment A-1 sets forth a circumstance under which TPI *may* terminate for convenience. (*See* Doc. 79 at 21.) It does not purport, as Plaintiff seemingly contends, that termination for convenience was only allowed under specific circumstances.

that it "did not expressly nor impliedly agree to notice by email because the December 2022 termination notice was the only 'notice' ever sent by either party that was required by the Master Agreement." (Doc. 97-1 at 7 ¶ 39.)

The provision itself proclaims to command "all notices" that are "required by [the Master] Agreement or a supply agreement" be in writing and delivered to the addresses set forth on the purchase orders. (Doc. 79 at 12.) On its face, the provision contemplates that such notices could be delivered "personally, or by fax or an overnight delivery service." (*Id.*) By its plain meaning, this language does not contemplate using email to effectuate notice. Though the Advisory Council offers some guidance here:

> The parties [can] agree on what type of written form they intend to use. They may, for instance, agree that they only accept paper letters sent by a particular courier service. Unless the parties have limited the notion of writing, there should be a presumption that electronic communications are included in the term 'writing.' This presumption could be strengthened or weakened in accordance to the parties' prior conduct or common usages.

CISG Opinion No. 1, cmt. 13.2. Although the focus here is less on the term "writing" and more on the definition of "addresses," the Advisory Council guidance is nonetheless instructive. Again, it is undisputed that TPI had not received any hard copy letters from Kumpers prior to January 2023. (Doc. 82 at 9 ¶ 60; Doc. 105 at 11 ¶ 1.) Even so, either parties' interpretation of the contractual language is possible—that is, it may have a hardline requirement for physical mail or, instead, contemplate email. Additionally, issues of trade practices under CISG Article 9, as well as the Court's view of TPI's waiver defense, has convinced the Court that a genuine issue of material fact exists with respect to whether the December 22, 2022 email notice was sufficient to terminate the agreement. Additionally, the Court is not persuaded by TPI's contention that any non-compliance with the Notice Clause is a technical, non-material breach because Kumpers acknowledged notice. Indeed, Kumpers signifying that it accepted receipt and would "respond in turn" may have very well meant that it was going to challenge the sufficiency of the notice.

///

///

At bottom, there is a genuine dispute of material fact concerning whether TPI properly noticed its termination on December 22, 2022.[13]  Therefore the Court will deny summary judgment on this issue.

### 3. Breach of Contract (Count III)

Count III of Kumpers' First Amended Complaint is a breach of contract claim predicated on an alleged valid and binding contract created when Kumpers accepted TPI's offer to purchase 55% of its 2023 volume from Kumpers.  (Doc. 66 at 9 ¶ 60.)  Kumpers alleges that the breach occurred when TPI failed to purchase 55% of its 2023 UD600 volume requirement from Kumpers.  (*Id.* ¶ 61.)

TPI asserts a number of challenges to Kumpers' claim that Ms. Hensing's April 27, 2022 email established an offer for 2023 volumes that Kumpers accepted.  The Court sets these arguments out here:  First, under both Arizona law and the CISG, the offer is not sufficiently definite, nor does it express an intent to be bound.  (Doc. 81 at 17 (citing *Schade v. Diethrich*, 760 P.2d 1050, 1060–61 (Ariz. 1988); *Chateau des Charmes Wines*, 328 F.3d at 531).)  Second, there was no meeting of the minds, as the parties did not share intent with respect to price stability in the terms of the Supplier Agreement.  (*Id.* at 17–18.)  And third, Kumpers did not accept the offer because it failed to assent to the terms of improved payments, performance improvements, and price stability.  (*Id.* at 18–19.)

Kumpers contends that because formation of a contract is a factual inquiry under the CISG, whether a valid offer and acceptance occurred based on the April 27, 2022 emails must be considered by a jury.  (Doc. 97 at 15–16.)  Further, Kumpers argues that even if the offer was indefinite, the Arizona UCC would fill in missing pieces of the agreement following acceptance.  (*Id.* at 18.)

---

[13]  In its Response, Plaintiff also argues that even if TPI properly terminated the Agreement in December 2022, it was already in breach of the Supplier Agreement because it had yet to purchase the requisite amount of raw material for that month.  (Doc. 97 at 18.)  In response, Plaintiff argues that the parties could mutually agree to shift quantities without being in breach of the contract.  (Doc. 11 at 14.)  The Court does not believe that this argument is within the scope of Count II's allegations, which are specifically directed at whether TPI possessed the ability to terminate for convenience, not whether it was in breach of the agreement at the time it terminated the contract.  As a result, the Court will not consider the argument at this time.

The touchstone of determining whether a contract was formed under the CISG is CISG Article 8.  *See* CISG art. 8(1).  Although the Court has found that application of Article 8 with respect to contract interpretation has been derogated, the provisions still apply in determining whether a contract was formed in the first instance.  *See* CISG Opinion No. 3.  Relevant here is CISG Article 8(1), which provides that "statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was."  Under CISG Article 11, "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form."  A proposal is an offer "if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance."  CISG, art. 11; *id.*, art. 14(1).  Moreover, "a proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price." *Id.*  In turn, an offer is accepted if the offeree makes a "statement . . . or other conduct . . . indicating assent to an offer."  *Id.*, art. 18.  While the CISG does not contain specific provisions for what may constitute a "meeting of the minds," reading Articles 14(1) and 18(1) together informs mutual assent.  *See Simar Shipping Ltd. v. Glob. Fishing, Inc.*, 540 F. App'x. 565, 567 (9th Cir. 2013) (unpublished).  Similar to common law jurisdictions, mutual assent is an essential element of a contract under the CISG.  *See Jan Yoen Textile Inc. v. AKM Textile Inc.*, CV 16-05349 SJO (JEMx), 2017 WL 7156244, at *3 (C.D. Cal Nov. 27, 2017) (citing *Simar Shipping*, 540 F. App'x. at 567).

The April 2022 email from Ms. Hensing stated: "After further internal review and discussion, contingent on Kuempers ability to demonstrate consistent improved delivery performance and agreement on improved payment terms, the most we can offer Kuempers at this time and at this pricing of the NX 58.5 UD600 is 55%."  (Doc. 82 at 3–4 ¶ 17 (cleaned up).)  On May 2, 2022, Dr. Maggiarosa responded, stating that "although 55% of your 2023 volume . . . seems to be quite low, we accept your proposal in anticipation that this will further strengthen our business relationship."  (Doc. 82-4 at 67–68.)  In both its December 2022 and February 2023 termination letters, TPI notified Kumpers that it was

terminating the Supplier Agreement, but did not specifically state that it was terminating any other agreement. (*See* Doc. 82-1 at 19–20, 27–28.) Both letters, however, specifically maintain that "[t]his correspondence also confirms that TPI does not have any other Supplier Agreements or further commitments between the parties at this time." (*Id.*)

Based on Ms. Hensing's email, TPI may have made an offer that Kumpers thereafter accepted. Ms. Hensing's email references the timeframe for the agreement, the quantity measured in volume, and a comment on how current pricing necessitating the commitment of only 55% of the volume. A reasonable juror may interpret the email as an offer for 55% of 2023 volumes contingent on improved performance and payment terms. *See* CISG, art. 14; *see also id.*, art. 55 ("Where a contract has been validly concluded but does not expressly or implicitly fix or make provision for determining the price, the parties are considered, in the absence of any indication to the contrary, to have impliedly made reference to the price generally charged at the time of the conclusion of the contract for such goods sold under comparable circumstances in the trade concerned."). Likewise, a reasonable juror may consider Ms. Hensing's email as a non-committal response to Kumpers need to secure 2023 volumes. Additionally, Ms. Maggiarosa's email is fairly clear: she accepted TPI's "proposal." *See id.*, art. 18 ("A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance."); *see also id.*, art. 14 (defining an offer as, in part, "[a] proposal for concluding a contract"). Regardless, TPI maintains that Kumpers failed to accept "all material terms" of the offer but it has not sufficiently argued how Kumpers' assent failed to abide by the requirements for acceptance. (*See* Doc. 81 at 18 (citing CISG art. 19(1) (adopting the mirror image rule).) While parties must be mindful of the mirror image rule, there is no requirement under the CISG that every term in an offer be parroted back to offeror during acceptance. *See* CISG art. 18; CISG art. 8. At bottom, a material question of fact exists with respect to whether TPI's April 2022 email constituted an offer that Kumpers accepted.

Next, TPI argues that Kumpers' conduct after accepting the alleged 2023 volume agreement shows that the parties did not have a "meeting of the minds" regarding all

material terms.  (Doc. 81 at 17–18.)  In June 2022, shortly after the parties allegedly formed the 2023 volume agreement, Kumpers submitted a response to TPI's request for proposals ("RFP") for 2023 supplier agreements, quoting a price approximately €0.68 more than that under the existing Supplier Agreement.  (*See* Doc. 82 at 5 ¶¶ 29–30.)  Then, in November 2022, Kumpers sent TPI another response for 2023 volumes, quoting a price €1.26 more per kg than the price would be under the existing Supplier Agreement.  (*Id.* at 8 ¶ 47.)  Kumpers November 2022 response also included suggestions for fixing the parties' ongoing pricing dispute.  (*Id.*)  According to TPI, Kumpers would not have responded to the RFP with such high price proposals if it had agreed to to bound by the price stability terms the alleged April 2022 "offer."  (Doc. 81 at 18.)  However, this argument is somewhat belied by the fact that the parties formed the alleged agreement in April 2022 and Kumpers did not send its RFP to suppliers until June 1, 2022.  It is reasonable to think that Kumpers would attempt to secure a more lucrative and efficient deal with TPI after further realization of its losses in the wake of the Russo-Ukrainian War.  And in Kumpers' words, the responses to the RFP could be considered a proposal to amend the already formed contract.  (Doc. 97 at 16.)  Therefore, the Court finds that whether the parties mutually assented to the terms of the agreement is a genuine dispute of fact appropriate for the jury.

At bottom, a genuine question exists regarding whether a valid agreement was reached regarding 2023 volumes and whether TPI's December 2022 or February 2023 termination letters terminated that agreement.  Therefore, the Court will deny summary judgment on that issue.

### 4.    Promissory Estoppel (Count V)

Kumpers' fourth claim for relief is promissory estoppel based on alleged promises that TPI made to Kumpers to purchase 700 MT of materials under the Supplier Agreement and 55% of TPI's 2023 volume in a separate agreement.  (Doc. 66 at 11 ¶ 76.)  Further, Kumpers alleges that at the time "TPI made the promises, it reasonably knew would induce Kumpers to incur costs (e.g. signing a lease and committing to purchase certain minimums from its supplier SGL), pass up other opportunities, and induce Kumpers to perform work

with and sell product to TPI."  (*Id.* at 11–12 ¶ 77.)

TPI argues that it is entitled to summary judgment against Kumpers' promissory estoppel claim because Kumpers' lease addendum and Mr. Younes' deposition testimony show that Kumpers extended its lease prior to making any of the complained about promises.  (Doc. 81 at 19.)  TPI further contends because Kumpers confirmed the lease duration by March 30, 2022, the fact it was not reduced to a written and signed form until later precludes finding reliance.  (Doc. 110 at 15.)  In response, Kumpers contends the Google-translated lease "signed in May 2022" is inadmissible and cannot support summary judgment.  (Doc. 97 at 19.)

Because the CISG does not contain provisions regarding promissory estoppel, Arizona law controls.  *See Maxxsonics*, 2012 WL 962698, at *7.  "The elements of promissory estoppel are a promise, which the promissor [sic] should reasonably foresee would cause the promisee to rely, upon which the promisee actually relies to his detriment." *Contempo Const. Co v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz. Ct. App. 1987).

Courts have routinely held that, without a certified translation, "the proponent fails to carry its burden to show that a document is what [it] claims it is."  *Gonzalez v. Cheesecake Factory Restaurants, Inc.*, 21-CV-5017 (PKC) (SIL), 2023 WL 2477697, at *1 (E.D.N.Y. Mar. 13, 2023); *see also* Fed. R. Evid. 901(a) ("[T]he proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *Cassem*, 486 F. Supp. 3d at 532 n.4 ("It is well established that foreign language materials are inadmissible in the absence of an English translation certified to be true and accurate."). However, some courts have considered admissible at trial informal translations of documents through a deponent's testimony so long as he is fluent in the foreign language and English.  *See, e.g.*, *Ewald*, 2014 WL 12598867, at *6.

Even though the Court may not consider either lease addendum, it will give some weight to Mr. Younes' deposition testimony translating the lease.  As discussed, Mr. Younes was shown the May 2022 lease addendum and testified that it stated that Kumpers

was to extend the lease: "from the 30th of March 2022, from the option to the rental acceleration, extension, until the 31st of December, 2022, he took it as a balance, he extended it, I would say. It has been extended until first of -- first one of December 2023." (Doc. 82-1 at 59–60.) Mr. Younes later averred that "[p]rior to the expiration of the lease extension deadline, TPI offered Kumpers 55% of its 2023 Carbon Fabric requirements." (Doc. 97-1 at 6.) These facts present two realities. First, Kumpers may have executed the "May 2022" lease addendum in March 2023, which would imperil its ability to show it relied on TPI's promise. Second, Kumpers may have negotiated the terms of the lease extension in March 2022 but waited to execute the addendum until May 2022, after TPI's 2023 volume commitment. In this scenario, a reasonable jury could return a verdict for Kumpers, finding that it did not either material misrepresent or fail to rely on its pressing lease issues when negotiating the 2023 volumes with TPI. Therefore, a genuine issue of material fact exists with respect to when the lease agreement was executed and thus whether Kumpers relied on TPI's commitment. *See Anderson*, 477 U.S. at 248. Consequently, the Court will deny TPI's request for summary judgment summary judgment.

### 5.    Cost Recuperation Under the Supplier Agreement

TPI moves for summary judgment on Kumpers' claims that under the Supplier Agreement, it is entitled to recoup (1) exchange rate losses; (2) transportation costs; and (3) unrecovered energy and inflation surcharges. (Doc. 81 at 12.) In response, Kumpers argues that the contract is ambiguous and allows Kumpers to recover costs that impacted its conversion rate in the price set forth in Attachment B-1 to the Supplier Agreement. (Doc. 97 at 17.)

This is a pure issue of contract interpretation. Because the parties' have derogated the application of Article 8 in such instances, the Court will rely on general principles of contract law to discern the meaning of the challenged terms. *See In re Marriage of McCulloch & Parker*, 546 P.3d 109, 117 (Ariz. Ct. App. 2024) ("When determining the meaning of a written agreement, we look to the language used by the parties, and if it is

clear and unambiguous, we go no further." (citing *Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966))).

TPI contends the express language of Section 5 of the Supplier Agreement does not support a claim for breach of contract based on non-payment of exchange rate losses. (Doc. 81 at 13.)  In response, Kumpers argues that the contractual language is ambiguous and that the exchange rate term allows it to recoup associated costs. (Doc. 97 at 17.)

Kumpers is not entitled to recoup exchange rate losses.  Section 5 provided that the "prices, discounts, labor rates and fees described [herein] establish [Kumpers'] commitment for the Products."   Section 5.2 outlined a mechanism for a "[f]oreign exchange rate" to account for fluctuations in currency value.  (*Id.*)  Specifically, the term provided that "[t]he exchange rate shall be reviewed quarterly based on the average change in the past 3 months to be found at www.oanda.com."  (*Id.*)  Section 5.2 is part of the "index-based" adjustment schedule outlined in Section 5.1.1.  (*Id.*)  That section, as well as the surrounding terms, are silent with respect to TPI's responsibility to pay exchange rate losses.  Moreover, the Court finds no ambiguity in the language of Section 5.2, as it plainly sets forth a mechanism for quarterly evaluations of the exchange rate.  (*Id.*)  Therefore, under the plain terms of the contract, Kumpers is not entitled to recoup exchange rate losses.

Likewise, Kumpers is not entitled to recoup freight or transportation costs.  Section 5.4 of the Supplier Agreement provided that "[p]ricing in Attachment B includes a per container rate . . . of 4000€.  As part of the quarterly pricing review, the freight cost element *may be subject to adjustment*, if the change in costs is greater than or equal to +/-500€, as verified by invoices for TPI shipments."  The terms here are exceedingly clear.  A quarterly pricing review, which must take place prior to the dates outlined in § 5.5, may result in an adjustment of freight costs.  The term does not guarantee Kumpers any change, nor does it entitle it to retroactively charge TPI for freight costs incurred in excess of €4,500.

Kumpers cannot recoup inflation or energy surcharges under the force majeure clause in the Supplier Agreement.  The force majeure clause provided:

Force Majeure of the Master Agreement is superseded as follows: Notwithstanding anything to the contrary provided herein, neither Party will be liable to the other for damages for failure to carry out this Supply Agreement in whole or in part when the failure is due to causes beyond Supplier's or Customer's (as applicable) reasonable control, …; provided, that, such excuse from liability shall be effective only to the extent and duration of the event(s) directly causing the failure or delay in performance and provided that the party has not caused such event(s) to occur . . . .

(Doc. 79 at 19.)  Kumpers contends that this clause "obligated TPI to cooperate to mitigate the effect of force majeure events." (Doc. 97 at 17.)  Not so.  The clause acts as a defensive mechanism to excuse performance and prevent liability.  *See Vereit Real Est., LP v. Fitness Int'l, LLC*, 529 P.3d 83, 87–88 (Ariz. Ct. App. 2023).  This term, like the others, is not ambiguous.  And the plain language in the term does not entitle Kumpers to seek costs related to inflation and energy surcharges.  Or, in other words, the clause does not provide an affirmative cause of action for Kumpers to recuperate costs associated with TPI's alleged non-performance of the contractual term.  *See id.* (explaining that the typical force majeure clause is a shield, not a sword).

Therefore, the Court finds summary judgment on this issue appropriate because Kumpers is not entitled to (1) exchange rate losses; (2) transportation costs; and (3) unrecovered energy and inflation surcharges under the unambiguous terms of the Supplier Agreement.

## IV.    CONCLUSION

The Court will briefly summarize its disposition as to each requested ground for relief in the parties respective Motions for Partial Summary Judgment (Doc. 78; Doc. 81.)  First, the Court will discuss Kumpers' Motion (Doc. 78.)  As to the first issue, the Court having found that the CISG governs the dispute between the parties will **grant** summary judgment.  Arizona law applies to the extent that the CISG does not provide the rule of decision or otherwise preclude its application.  As to the second issue, the Court having found that (a) changed circumstances and (b) good faith are not conditions precedent to invoking the right to terminate a contract for convenience will **deny** summary judgment.  However, as discussed, the parties to the various Agreement must have acted in good faith

consistent with its duty under all Arizona contracts.  Finally, as to the third issue, the Court will **grant** summary judgment on the following affirmative defenses as directed at all Counts in the First Amended Complaint: (1) failure to state a claim upon which relief may be granted; (2) inability to prove essential elements of the claims asserted; (3) no meeting of the minds and the terms are indefinite as to the breach of contract claim asserted in Count III; and (4) statute of frauds.  As noted, the grant of summary judgment against affirmative defenses (2) and (3) is solely because they are not affirmative defenses and the Court's disposition does not preclude these issues being raised at trial to refute Kumpers' case in chief.  The Court will also **grant** summary judgment on the affirmative defense of (6) failure to mitigate damages as to Counts I, III, and V.  Finally, the Court will **grant** summary judgment on the affirmative defense of estoppel.

Regarding TPI's Motion, the Court will **deny** summary judgment against Counts I, III and V.  The Court will **grant** summary judgment and find that the Supplier Agreement contains a Merger Clause that derogates the application of CISG Article 8 with respect to consideration of extrinsic evidence at all points of contractual interpretation.  Further, the Court will **grant** summary judgment and find that the contract does not entitle Kumpers to recoup (1) exchange rate losses; (2) transportation costs; and (3) unrecovered energy and inflation surcharges.

**IT IS HEREBY ORDERED** granting in part and denying in part Plaintiff Kumpers' Motion for Partial Summary Judgment (Doc. 78).

**IT IS HEREBY ORDERED** granting in part and denying in part Defendant TPI's Motion for Partial Summary Judgment (Doc. 81).

Dated this 25th day of February, 2025.

Honorable Susan M. Brnovich
United States District Judge